AFFIDAVIT

I, Paul J. Moloney, Special Agent of the Drug Enforcement Administration (DEA), Washington Division Office (WDO), Washington, DC, (hereinafter Affiant) being duly sworn, depose and state the following:

Introduction

1. I am "an investigative or law enforcement officer" of the United States within the meaning of Title 18, United State Code Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for the offenses enumerated in Section 2515 of Title 18, United States Code.

2. I have been a Special Agent (SA) with the DEA since 1997. I am currently assigned to Enforcement Group Forty-six at the Washington Division Office, located in the District of Columbia. While with the DEA, I have investigated, and assisted in the investigation of, hundreds of narcotics violators. I have previously participated in investigations which have led to the arrest and conviction of narcotics dealers. Since 1997, I have received training and experience in interviewing and interrogation techniques, arrest procedures, search warrant applications, surveillance, undercover operations, operations involving cooperating sources, and a variety of

other investigative tools available to law enforcement officers.  In the course of my training and experience, I have become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of proceeds derived from the sale of narcotics, and the organization of drug conspiracies.  In the course of conducting these investigations, your Affiant has been involved in the use of the following investigative techniques: interviewing informants and Cooperating Sources; conducting physical surveillance; conducting short-term and long-term undercover operations, including reverse undercover operations; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing telephone pen register and caller identification data; conducting court-authorized electronic surveillance; preparing and executing search warrants which have led to substantial seizures of narcotics, firearms, and other contraband.

    3.   Based on your Affiant's training, experience, and participation in narcotic and drug-related investigations and the training and experience of other Agents with whom I am working closely with in this investigation, your Affiant knows that:

a) Individuals who deal in illegal controlled substances maintain books, records receipts, notes, ledgers, bank records, money orders, and other documents relating to the importation, manufacture, transportation, ordering, sales, purchase, and distribution of illegal controlled substances.  These books, records, receipts, ledgers, money orders, etc., are maintained where the dealers in those illegal controlled substances have ready access to them, such as in a secure location within their residences, the residences of family members, friends and associates, in the places of operation of the drug distribution activity, such as a stash house or safe house, or in a business location with which the trafficker is associated or otherwise has some degree of command or control over.

b) Individuals who deal in illegal controlled substances routinely conceal in their residences and/or the residences of family members, friends and associates, as well as their business locations, and/or in the places of operation of the drug distribution activity, such as a stash house or safe house, large quantities of

        currency, financial instruments, precious stones/metals, jewelry, electronics equipment, and other items of value, which typically are proceeds of illegal controlled substance transactions.

c) It is common for individuals who deal in the sale of illegal controlled substances, particularly methamphetamine, to secrete contraband related to the activity, such as scales, razors, packaging materials, cutting agents, glassware, microwave ovens, laboratory equipment, chemicals, pots, pans, dishes, and other items used in the preparation and packaging of methamphetamine at their residences, or the residences of family members, friends or associates, in their business locations, or in the places of operation of the drug distribution activity, such as a stash house or safe house.

d) Individuals who deal in the sale and distribution of controlled substances commonly maintain addresses and telephone number books or other documents which reflect the names, addresses, and/or telephone numbers for their associates in their illegal drug organization. These

       individuals utilize cellular telephones and pagers, which reflect names, addresses, and/or telephone systems to maintain contact with their associates in their illegal drug businesses. These telephone records, bills and pager numbers are often found in their place of residence, or the residence of family members, friends, or associates, in their business locations, or in the places of operation of the drug distribution activity, such as a stash house or safe house.

e) Individuals who deal in the illegal controlled substances often take photographs of themselves, their associates, their property and illegal contraband.  These photos are usually maintained in their place of residence, or the residences of family members, friends, or associates, in their business locations, or in the places of operation of the drug distribution activity, such as a stash house or safe house.

f) Individuals who deal in the distribution of illegal controlled substances often maintain records relative to their drug trafficking activities.  These records and documents are usually secreted in their places of residence, or

       the residences of family members, friends, or associates, in their businesses, or in the places of operation of the drug distribution activity such as a stash house or safe house. These documents often include ledgers, account books, calculations, or other notations which reflect inventories and quantities of narcotics purchased and distributed.  The documents also may include "pay-owe sheets," which are documents that bear calculations, customers names, quantities, and prices.  The notations made on or in these documents are often encrypted by the trafficker in an attempt to disguise the true nature of the records from law enforcement.

g)    Individuals who distribute illegal controlled substances maintain documents, letters, and records relating to the illegal activity for long periods of time.  This documentary evidence is usually secreted in their places of residence, or the residences of family members, friends, or associates, in their businesses, or in the places of operation of the drug distribution activity such as a stash house or safe house.  This documentary evidence includes, but is not limited

        to, telephone numbers, telephone books, address books, credit card receipts, hotel receipts, train and bus tickets, airline boarding passes or itineraries, baggage claim tickets, car rental receipts, amounts and records in fictitious names, false identification documents, money orders, casino receipts, account notations, "pay-owe sheets," cashiers checks relating to transactions, and other records indicating the existence of storage facilities used in narcotics trafficking.

h)    Individuals involved in the trafficking of illicit narcotics often own, possess, and/or use weapons as a means to facilitate their drug trafficking activities.  These weapons are most often secreted in their residences, the residences of family members, friends or associates, in their business locations, or in the places of drug distribution activity, such as a stash house or safe house.

4.    Based on the investigation in which your affiant has participated in and for the reasons which will be set forth herein, there is probable cause to believe that ROBERT FRANJELO, a.k.a. "Robbie Franjelo," and several

of his associates, known and unknown, are committing the following federal offenses: (i) possession with the intent to distribute controlled substances, in violation of Title 21 United States Code, §841 (a)(1); (ii) conspiracy to commit such offenses, in violation of Title 21 United States Code, § 846; (iii) use of communications facilities in the commission of the above offenses involving controlled substances, in violation of Title 21 United States Code, § 843(b).  In addition, I believe for the reasons to be set forth infra, there is probable cause to show that within the basement apartment of 35 New Yoak Avenue, NW, Washington, DC, there is evidence of those crimes and that residence has been, and will continue to be used, by ROBERT FRANJELO and his associates in furtherance of the crimes enumerated above.

     5.   Throughout this investigation, law enforcement officers and agents have worked together to collect and record information about the illegal activities of those under investigation.  This affidavit is based in part on personal knowledge derived from the participation of your Affiant in the investigation, and in part, upon the sources of information and belief.  The sources of information and belief include statements made by defendants, witnesses, or other cooperating sources of

information, observations made by undercover officers, and subpoenaed information including cellular telephone billing records.

6.   Not every fact known to this investigation or by the government is set forth in this affidavit. Additionally, unless otherwise noted, wherever in this affidavit I assert that a statement was made by an individual, that statement is described in substance, and in part, and is not intended to be a verbatim recitation of the entire statement.  I believe the information presented in this affidavit will establish probable cause to show that ROBERT FRANJELO and his associates have been and are currently engaged in those crimes enumerated above and that there is evidence of those crimes within the basement apartment located at XX XXX XXXX XXXXXX, XX XXXXXXXXXX, XX. Therefore, only those aspects known to this investigation which support that probable cause are presented in this affidavit.

<u>The Target Address</u>

7.   This affidavit is respectfully submitted in support of an application for a warrant to search the basement apartment at XX XXX XXXX XXXXXX, XX, XXXXXXXXXX, XX, hereinafter referred to as the "Target Address."  The Target Address is described as an apartment located in the

basement or bottom floor of a row home.  The row home itself constructed of brick and displays the numerals "35" in brass colored lettering to the right of the main entrance.  There are several grey colored decorative pillars, each of which extends vertically on the front of the building.  The Target Address is accessed by several steps leading down from a common walkway.  The front door of the Target Address is described as being pale green in color and is enclosed by a black metal security gate.

PROBABLE CAUSE

8.   In August 2005, Agents of the Drug Enforcement Administration (DEA) began an investigation of an organization responsible for the shipment of methamphetamine into the District of Columbia from a source in Phoenix, Arizona.  Members of this organization re-distributed the methamphetamine to a network of customers in Northern Virginia and the metropolitan area of the District of Columbia.

9.   Amongst the number of organization members identified was Washington, DC, resident ROBERT FRANJELO (hereafter FRANJELO).  Through the course of the conspiracy, FRANJELO had received multiple ounces of methamphetamine and re-distributing the illegal to a

customer base in the metropolitan area of the District of Columbia.

10. In or about August 2005, a Cooperating Source, hereafter referred to as "CS," began cooperating with the DEA in August 2005. During a number of debriefings, the CS indicated that he/she was acquainted with a number of methamphetamine traffickers located in the Washington, DC, one of whom included FRANJELO.

11. The CS indicated that FRANJELO has been involved in the trafficking and use of methamphetamine since 2004. Through his/her interaction with FRANJELO, CS-1 came to know that FRANJELO maintained contact with a number of individuals involved in the transport and retail sales of methamphetamine. Through his contacts, FRANJELO was able to obtain quantities of methamphetamine which he sold to a network of customers in the District of Columbia for profit. The money earned through the sale of methamphetamine allowed FRANJELO to sustain his chemical dependency and obtain additional quantities of methamphetamine.

12. CS-1 identified the Target Address as FRANJELO's residence. On at least two occasions in the summer of 2005, Special Agents instructed CS-1 to meet with FRANJELO in order to discuss FRANJELO's drug trafficking activities.

During one of the meetings with FRANJELO, CS-1 observed one of FRANJELO's associates to be armed with a handgun. On the other occasion, CS-1 observed what he/she to be a quantity of Gamma Hydroxy-Buterate (GHB). On both occasions, CS-1 told Special Agents that he/she believed FRANJELO to be under the influence of GHB.

13. On or about December 1, 2005, at the instruction of Special Agents, CS-1 met with FRANJELO at the Target Address. During the meeting, FRANJELO held a discussion with CS-1 regarding FRANJELO's drug trafficking activities. Based on a number of comments made by FRANJELO during the discussion, CS-1 believed that FRANJELO was currently involved in the distribution of methamphetamine and utilized the Target Address to further his criminal activities.

14. While at the Target Address, CS-1 was able to make a number of observations. CS-1 observed drug paraphernalia including a device utilized in the consumption of methamphetamine. In addition, FRANJELO displayed the contents of a black canvas bag to CS-1; the contents included numerous zip-lock baggies known to CS-1 as being utilized in the preparation of methamphetamine distribution. CS-1 also noted that several of the zip-locks contained a white-colored powder residue.

15. CS-1 also observed a number of items that he/she knew were purchased by FRANJELO with drug sales proceeds within the Target Address or otherwise obtained through other criminal activities. During the meeting with CS-1, FRANJELO discussed a laptop computer. FRANJELO told CS-1 that the laptop was given to him by an associate who had stolen it from a District of Columbia hotel. CS-1 also observed a computer that in previous conversations FRANJELO had told CS-1 that he had received from a customer in exchange for two eight-balls (3.5 grams) of methamphetamine.

CONCLUSION

Based on all of the forgoing information presented in this affidavit, I submit there is probable cause to believe that ROBERT FRANJELO and several of his associates, known and unknown, utilized the basement apartment residence at XX XXX XXXX XXXXXX, XX, XXXXXXXXXX, XX, to facilitate those violations described above, and that within that residence is evidence of crimes to include documents, records, and other items further described in Schedule A listed in the attachment to this affidavit.

_____
Paul J. Moloney
Special Agent
Drug Enforcement Administration

SWORN TO AND SUBSCRIBED Before Me this \_\_\_ day of December 2005.

_____
United States Magistrate Judge
District of Columbia